IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **RICHARD JORDAN, et al.,** | : | |
| | : | CIV NO. 3:20-CV-414 |
| | : | |
| **Plaintiffs,** | : | (Judge Mariani) |
| | : | |
| v. | : | (Magistrate Judge Carlson) |
| | : | |
| **SOUTHWESTERN ENERGY CO. et al.,** | : | |
| | : | |
| **Defendants.** | : | |

## MEMORANDUM OPINION

### I.   Statement of Facts and of the Case

This case comes before us for consideration of the plaintiffs' motion to compel the defendants to produce records relating to the involvement of a subsidiary company, Southwestern Energy Services (SES), in the transactions which lie at the heart of this oil and gas lease royalty dispute. (Doc. 54). The defendant corporations have resisted these requests for production asserting that they cannot produce records possessed by their subsidiary, SES, but the allegations and evidence suggest that the defendant corporations exercise sufficient control and enjoy a sufficiently symbiotic relationship that they may be compelled to require the production of these records possessed by their subsidiary. Therefore, for the reasons set forth below, we will grant this motion to compel.

This close and controlling relationship between SES and the defendant

1

corporations is set forth in detail in the plaintiffs' amended complaint, whose allegations frame the scope of relevant discovery here. (Doc. 39).

At the outset, the amended complaint describes in relationship between the named defendants and SES. According to the amended complaint, the defendant Southwestern Energy Company, is a Delaware corporation which does business as SWN. (Id. ¶¶ 5-8). The second corporate defendant SWN Production Company LLC, or SWN Production, is a corporate affiliate of SWN. (Id. ¶¶9-18). According to the plaintiffs SWN and SWN Production share corporate offices, personnel, and management. (Id.) Southwestern Energy Services (SES), in turn, is described as an "SWN's affiliated marketing company." (Id. ¶ 30).

The well-pleaded facts in the plaintiffs' complaint, which guide our consideration of this motion indicate that on November 8, 2008, Richard and Maureen Jordan[1] entered into an oil and gas lease with Alta Resources, LLC., relating to a property they owned in Susquehanna County, Pennsylvania. (Doc. 39, ¶¶1-2). This lease provided for the extraction of hydro-carbons resources from the plaintiffs' property and prescribed the payment of royalties to the Jordans. (Id., ¶¶1-4, Ex.1). On February 11, 2015, the Jordans were informed that another firm, SWN Production Company, LLC, had acquired the rights to their gas lease. (Id., ¶19).

---

[1] Richard and Maureen Jordan are acting as their own counsel in this case, but it is represented that the Jordans are trained and schooled as attorneys.

2

According to the complaint, SWN Production is affiliated SWN. (Id. ¶¶ 7-17). The plaintiffs allege that SWN and SWN Production share the same physical office space, website address, have common officers, directors, managers and employees, and make no distinctions between their separate operations. (Id.) The thrust of the complaint focuses on the actions of SWN Production and a separate uncharged entity, Southwestern Energy Services (SES), which is described as an "SWN's affiliated marketing company." (Id. ¶ 30). Beginning in April of 2015, SWN Production sent monthly royalty payments and statements to the Jordans. (Id., ¶¶ 20-22). Sometime after SWN Production assumed responsibility for this lease it is alleged that: "Plaintiffs, had learned from reading reported decisions in other royalty owner lawsuits against other companies such as SWN and SWN Production, that it was a common practice for the production company to transfer gas from the production company to an affiliated marketing company, and to pay royalties based on an artificially created transfer price." (Id., ¶ 27). Learning of this practice and believing that the practice violated the terms of their lease, the Jordans filed a praecipe in state court to toll any statute of limitations, (Id., ¶ 24), and began making a series of inquiries of SWN officials "as a royalty" owner regarding the manner in which their royalties were calculated. (Id., ¶¶ 24-33).

According to the plaintiffs' complaint:

3

29. Plaintiffs' inquires [sic] to SWN were for the purpose of determining if SWN used a marketing company to make downstream sales of Plaintiffs' gas and if any deductions were taken.

30. [SWN's in-house counsel] confirmed that Plaintiffs' gas was in fact transferred to SWN's affiliated marketing company, Southwestern Energy Services (SES), for sale downstream.

31. In response to Plaintiffs' further question as to whether in calculating Plaintiffs' royalty any deductions were taken from the downstream sales price received by SES, [SWN's in-house counsel] stated that the price on which Plaintiffs' royalty was calculated included a deduction for transportation costs to where the gas was sold downstream.

32. [SNW's in-house counsel] confirmed that the price on which the Plaintiffs' royalty was paid was not derived from the downstream sales price received by the marketing company, without deductions.

(Id. ¶¶ 29-32).

The plaintiffs' allege that this marketing arrangement violates paragraph 8 of the addendum to their oil and gas lease which provides as follows:

> Royalties shall be paid without deductions, directly or indirectly, for the costs of producing, gathering, storing, separating, treating, dehydrating, compressing, transporting, or otherwise making the oil and/or gas produced from the leased premises ready for sale or use. All oil and gas royalty shall be paid free of all cost to the point of sale and at fair market value, measured by volume at the wellhead, with the exception of Lessor's prorated share of any taxes, measured by volume on the oil and/or gas royalty. Any proceeds accruing to the Lessee pursuant to a sale under a non-arms length contract (or other disposition other than by an arms length contract) shall be at least equivalent, for Lessor's royalty purposes, to the gross proceeds derived from, or paid under comparable arms length contracts for purchases, sales or other dispositions of like quality gas in the same gas field. However under no circumstances shall the value of production for royalty purposes be less

4

> than the gross proceeds accruing to the Lessee either directly or indirectly. Royalty on production paid to Lessor shall be tendered monthly.

(Id., ¶ 36).

Viewing the alleged deduction of Southwestern Energy Services' costs from the sales price of the gas and calculation of royalties as a violation of this provision of the lease agreement, the Jordans have brought a breach of contract claim against SWN and SWN Production. (Id. 21-22). In addition to this breach of contract claim, the Jordans appear to bring tort allegations in the nature of a fraud claim against these defendants, alleging that the monthly royalty statements provided by the defendants were intentionally false and misleading in that they did not disclose the deductions made for SES's transportation costs when calculating monthly royalties. (Id.). On the basis of these averments, the Jordans sought an accounting from the defendants, compensatory damages, and punitive damages for the defendants' allegedly tortious false and misleading behavior.

The amended complaint also details at length the closely interrelated nature of these corporate entities, stating that they share physical locations and staff and noting that one court has found that these corporate affiliates conduct their business exclusively through the parent corporation SWN. (Id. ¶ 114). Thus, SES's role in these transactions, and its intertwined relationship with the named corporate defendants lies at the heart of this litigation. Therefore, it is hardly surprising that

the plaintiffs have sought discovery of records from SES through its corporate parent and affiliates relating to the calculation of these royalties. The defendant corporations have objected to these requests for production contending that SES is a separate corporate entity and its records are not possessed by the other corporate defendants.

This motion to compel then ensued. This motion is fully briefed and is, therefore, ripe for resolution. For the reasons set forth below, upon consideration, the motion to compel will be granted.

## II. Discussion

Rulings regarding the proper scope of discovery are matters consigned to the court's discretion and judgment. A court's decisions regarding the conduct of discovery will be disturbed only upon a showing of abuse of that discretion. Marroquin-Manriquez v. I.N.S., 699 F.2d 129, 134 (3d Cir. 1983). This far-reaching discretion also extends to rulings by United States Magistrate Judges on discovery matters. In this regard:

> District courts provide magistrate judges with particularly broad discretion in resolving discovery disputes. See Farmers & Merchs. Nat'l Bank v. San Clemente Fin. Group Sec., Inc., 174 F.R.D. 572, 585 (D.N.J. 1997). When a magistrate judge's decision involves a discretionary [discovery] matter . . ., "courts in this district have determined that the clearly erroneous standard implicitly becomes an abuse of discretion standard." Saldi v. Paul Revere Life Ins. Co., 224 F.R.D. 169, 174 (E.D. Pa. 2004) (citing Scott Paper Co. v. United States, 943 F. Supp. 501, 502 (E.D. Pa. 1996)). Under the standard, a magistrate judge's discovery ruling "is entitled to great deference and

is reversible only for abuse of discretion." Kresefky v. Panasonic Commc'ns and Sys. Co., 169 F.R.D. 54, 64 (D.N.J. 1996); see also Hasbrouck v. BankAmerica Hous. Servs., 190 F.R.D. 42, 44-45 (N.D.N.Y. 1999) (holding that discovery rulings are reviewed under abuse of discretion standard rather than de novo standard); EEOC v. Mr. Gold, Inc., 223 F.R.D. 100, 102 (E.D.N.Y. 2004) (holding that a magistrate judge's resolution of discovery disputes deserves substantial deference and should be reversed only if there is an abuse of discretion).

Halsey v. Pfeiffer, No. 09-1138, 2010 WL 2735702, at *1 (D.N.J. Sept. 27, 2010).

The exercise of this discretion is guided, however, by certain basic principles. At the outset, Rule 26(b) of the Federal Rules of Civil Procedure generally defines the scope of discovery permitted in a civil action, prescribes certain limits to that discovery, and provides as follows:

> (b) Discovery Scope and Limits.
>
> (1) *Scope in General*. Unless otherwise limited by court order, the scope of discovery is as follows: Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit. Information within this scope of discovery need not be admissible in evidence to be discoverable.

Fed. R. Civ. P. 26(b).

Thus, our discretion is limited in a number of significant ways by the scope of Rule 26 itself, which provides for discovery of only "nonprivileged matter that is relevant to any party's claim or defense." Accordingly, "[t]he Court's discretion in

7

ruling on discovery issues is, therefore, restricted to valid claims of relevance and privilege." Robinson v. Folino, No. 14-227, 2016 WL 4678340, at *2 (citing Jackson v. Beard, No. 11-1431, 2014 WL 3868228, at *5 (M.D. Pa. Aug. 6, 2014) ("Although the scope of relevance in discovery is far broader than that allowed for evidentiary purposes, it is not without its limits. . . . Courts will not permit discovery where a request is made in bad faith, unduly burdensome, irrelevant to the general subject matter of the action, or relates to confidential or privileged information")).

Therefore, at the outset, it is clear that Rule 26's definition of that which can be obtained through discovery reaches any nonprivileged matter that is relevant to any party's claim or defense, and valid claims of relevance and privilege still cabin and restrict the court's discretion in ruling on discovery issues. Furthermore, the scope of discovery permitted by Rule 26 embraces all relevant information, a concept which is not confined to admissible evidence but is also defined in the following terms: "Information within this scope of discovery need not be admissible in evidence to be discoverable." Fed. R. Civ. P. 26(b)(1). Rather, Rule 26 states that "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense." This concept of relevance is tempered, however, by principles of proportionality. Thus, we are now enjoined to also consider whether the specific discovery sought is "proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the

parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1). "Thus, it has been said that the amended rule 'restores the proportionality factors to their original place in defining the scope of discovery.' " Fassett v. Sears Holdings Corp., 319 F.R.D. 143, 150 (M.D. Pa. 2017) (quoting Wertz v. GEA Heat Exchangers Inc., No. 1:14-CV-1991, 2015 WL 8959408, at *2 (M.D. Pa. Dec. 16, 2015)).

A party moving to compel discovery bears the initial burden of proving the relevance of the requested information. Morrison v. Philadelphia Housing Auth., 203 F.R.D. 195, 196 (E.D. Pa. 2001). Once that initial burden is met, "the party resisting the discovery has the burden to establish the lack of relevance by demonstrating that the requested discovery, (1) does not come within the broad scope of relevance as defined under Fed.R.Civ.P. 26(b)(1), or (2) is of such marginal relevance that the potential harm occasioned by discovery would outweigh the ordinary presumption in favor of broad disclosure." In re Urethane Antitrust Litigation, 261 F.R.D. 570, 573 (D. Kan. 2009). One other immutable rule defines the court's discretion when ruling on motions to compel discovery. The court cannot compel the production of things that do not exist, nor can the court compel the production of evidence that is not in a party's possession, custody, and control.

In the instant case, there can be little doubt that the information sought from

9

SES through its corporate parent and affiliates is relevant to this litigation. Indeed, the means by which royalties were assessed lies at the heart of this lawsuit. Therefore, the contested issue in this discovery dispute is the question of whether the corporate defendants have possession, custody, or control over the records of SES by virtue of the closely intertwined working relationship. As to this issue the parties take diametrically opposed positions.

From the plaintiffs' perspective, the answer to this question turns on pragmatic matters of corporate relationships and control. Citing the significant overlap between SWN and SES in terms of staffing, facilities, management, organization, and day-to-day corporate activities, the Jordans argue that these party-defendants exercise sufficient control over the activities of SES that they may be compelled to produce relevant records relating to SES's involvement in their joint business activities.

In contrast, the defendants invite us to view this discovery dispute through a different analytical lens, one which focuses on the fact of corporate formalism and recognizes that SES, a non-party, is a legally distinct and separate corporate entity.

Presented with these two competing analytical paradigms, we note that it appears that the plaintiffs' view, which focuses on the realities of corporate control, is the ascendant and better reasoned view. As the Third Circuit has observed:

> In the absence of control by a litigating corporation over documents in the physical possession of another corporation, the litigating

corporation has no duty to produce. Societe Internationale v. McGranery, supra; Searock v. Stripling, 736 F.2d 650, 653 (11th Cir.1984) ("control is the test with regard to the production of documents [and] is defined not only as possession, but as the legal right to obtain the documents requested on demand"); In re Folding Carton Antitrust Litigation, 76 F.R.D. 420, 423 (N.D.Ill.1977) ("the test is whether the party has a legal right to control or obtain" the documents); C. Wright & A. Miller, 8 Federal Practice & Procedure § 2210 ("Control is defined ... as the legal right to obtain the documents required on demand"). The location of the documents, whether within the territorial jurisdiction of the court or not, is irrelevant. Marc Rich & Co., A.G. v. United States, 707 F.2d 663, 667 (2d Cir.1983), cert. denied 463 U.S. 1215, 103 S.Ct. 3555, 77 L.Ed.2d 1400 (1983); In re Uranium Antitrust Litigation, 480 F.Supp. 1138, 1144 (N.D.Ill.1979).

Where the litigating corporation is the parent of the corporation possessing the records, courts have found the requisite control where "a subsidiary corporation acts as a direct instrumentality of and in direct cooperation with its parent corporation, and where the properties and affairs of the two [were] ... inextricably confused as to a particular transaction," Acme Precision Products, Inc. v. American Alloys Corp., 422 F.2d 1395, 1398 (8th Cir.1970). Even where the separate corporate entities have been observed, however, some courts have found the requisite control based on the fact that the parent had the power to elect a majority of the board of directors of the subsidiary. E.g., In re Uranium Antitrust Litigation, [480 F. Supp. 1138, 1152 (N.D. Ill. 1929)] (corporate parent Noranda held responsible for producing documents of wholly-owned subsidiaries but not documents of 43.8%–owned subsidiary which conducted its corporate affairs separately); see also Hubbard v. Rubbermaid, Inc., 78 F.R.D. 631, 637 (D. Md. 1978) (fact that wholly-owned subsidiaries were separate corporate entities was irrelevant and litigating parent had to produce documents held by its subsidiaries).

Gerling Int'l Ins. Co. v. Comm'r, 839 F.2d 131, 140 (3d Cir. 1988). Likewise, corporate subsidiaries have been directed to produce the records of their non-party corporate parents when the interrelationship between the companies is so extensive

11

that it can be inferred that the subsidiary has the ability to demand and have access to documents in the normal course of business. Camden Iron & Metal, Inc. v. Marubeni Am. Corp., 138 F.R.D. 438, 443 (D.N.J. 1991). Thus, "[i]f a party has control over or shares control of documents with a third person, then a court can order production by means of its power over the party litigant." Afros S.P.A. v. Krauss-Maffei Corp., 113 F.R.D. 127, 129 (D. Del. 1986). The key factual issues in making this determination of the degree of corporate party control over non-party corporation were: "the parent's ownership share in the subsidiary or affiliated corporation; whether the corporations had interlocking management structures; the degree of control exercised by the parent over the subsidiary's directors, officers, and employees." Afros S.P.A. v. Krauss-Maffei Corp., 113 F.R.D. 127, 129 (D. Del. 1986). As one court has observed:

> The Afros Court first noted that "[t]he control analysis for Rule 34 purposes ... [requires] that there be close coordination between" the litigating party and the non-party possessing the documents. Id. Next, the Afros Court explained that the " 'nature of the relationship' between the party over whom the court has jurisdiction and the non-party with possession of the documents will determine whether a motion to compel discovery should be granted" and that there were three factors "of paramount importance" to this inquiry: "first, the corporate structure encompassing the different parties; second, the non-party's connection to the transaction at issue; third, to what degree will the non-party receive the benefit of any reward in the case." Id. at 130.

Princeton Digital Image Corp. v. Konami Digital Ent. Inc., 316 F.R.D. 89, 93 (D. Del. 2016).

12

We believe that this multi-facetted control test is the proper paradigm to apply in the instant case as we consider the motion to compel the production of SES's records from the party-defendants, SES's parent and affiliated corporations. Applying this nuanced test, we have little difficulty concluding that the plaintiffs' motion to compel should be granted. The evidence proffered by the plaintiffs discloses a closely intertwined working relationship between SES and the named corporate defendants. These companies share physical facilities, staff, and management. Moreover, their financial dealings are intimately related and they play closely coordinated and overseen roles in the very hydro-carbon marketing and royalty transactions which are the gist of this litigation. Thus, SES and the named corporate defendants have a shared and symbiotic working relationship and financial interest in these transactions which describes a level of control that fully justifies compelled production of SES's records in this case. Accordingly, the motion to compel will be granted.

An appropriate order follows.

Submitted this 16th day of November 2022.

*S/ Martin C. Carlson*
Martin C. Carlson
United States Magistrate Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **RICHARD JORDAN, et al.,** : | |
| : | **CIV NO. 3:20-CV-414** |
| **Plaintiffs,** : | **(Judge Mariani)** |
| v. : | **(Magistrate Judge Carlson)** |
| **SOUTHWESTERN ENERGY CO. et al.,** : | |
| **Defendants.** : | |

## ORDER

AND NOW, this 16th day of November 2022, in accordance with the accompanying Memorandum Opinion, IT IS ORDERED that the plaintiffs' motion to compel (Doc. 54) is GRANTED.

*S/ Martin C. Carlson*
Martin C. Carlson
United States Magistrate Judge
